Filed 12/4/15  P. v. Gaspar CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074348 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F05744) |
| v. | |
| OSCAR GASPAR, | |
| Defendant and Appellant. | |

A jury found defendant Oscar Gaspar guilty of the first degree murder of Jesus "Cha-Chi" Garcia (Pen. Code, § 187, subd. (a))[1] by intentionally and personally discharging a firearm causing his death.  (§ 12022.53, subd. (d).)  The trial court sentenced defendant to an aggregate term of 50 years to life in state prison, consisting of

---

[1] Further undesignated statutory references are to the Penal Code.

1

25 years to life for the murder, plus a consecutive 25 years to life for the firearm enhancement.

Defendant appeals, contending the trial court prejudicially erred in (1) excluding evidence of Garcia's "prior domestic violence against" defendant's girlfriend, and (2) admitting autopsy photographs. He also asserts that his trial counsel was ineffective in (1) failing to request the pinpoint instruction CALCRIM No. 522, which would have told jurors that provocation may reduce murder from first to second degree, and (2) failing to request that references to his gang membership be redacted from a conversation between two witnesses that was played for the jury. We shall conclude that any error in excluding evidence of Garcia's prior domestic violence was harmless, and that the trial court properly admitted the challenged autopsy photographs. We shall further conclude that defendant failed to establish he was prejudiced by trial counsel's alleged errors. Accordingly, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Prosecution*

At approximately 1:37 a.m. on September 4, 2011, Sacramento police officers responded to a report of a shooting in the parking lot of the Idle Hour Bar in Sacramento. When they arrived, they found Garcia lying face down in the parking lot with five gunshot wounds to his back. Garcia was transported to the hospital where he died a short time later. Michael Chochla, a bouncer at the bar, identified defendant as the individual who shot Garcia.

Defendant (aka "Grumpy") went to the bar that night (September 3, 2011) with his then girlfriend Christina M,, Christina's sister Patricia, and their friend William "Memo" Montoya. Christina and Patricia spent the night drinking and dancing and "having a good time." Later that night, Garcia arrived with his cousins Anthony and Danny Campos. Christina and Patricia knew Garcia because their mothers were friends.

2

After Garcia entered the bar, Christina told defendant "[T]hat's one of the guys that raped me." Christina testified that she had been raped by Garcia and his friend Marcos Vermente in February 2010, and that she had not told defendant about the rape until that night in the bar.[2] Defendant told her to stay away from Garcia and sat at the bar drinking and "watching" while Christina danced with her sister. Defendant did not have any trouble with Garcia while they were at the bar. Defendant did not go up to Garcia, confront Garcia, or anything like that. He was in a "good mood."

Christina's testimony concerning the rape was contradicted by her sister Patricia, who testified that Christina told her that she had been raped by Vermente, not Garcia, but that Garcia was present when it happened. It was also contradicted by Detective Mark Johnson, who interviewed Christina two days after the shooting. According to Johnson, Christina told him that she first informed defendant about the rape in approximately March 2010, one month after it happened, and that defendant was comforting to her.[3]

John Bencomo, an acquaintance of defendant's, arrived at the bar with a couple of friends sometime after Garcia and his cousins. Bencomo went to the bar to meet some girls and ran into defendant. Bencomo told defendant that he had a handgun he wanted to get rid of, and defendant offered to buy it. Defendant told Bencomo that he "was having problems with somebody up in there . . . ." Bencomo had the gun, which was loaded, hidden inside his jacket and gave it to defendant long before the shooting.

When the bartenders announced that it was closing time, Patricia bought a final round of beers for their group. Everything seemed fine, and defendant gave Christina a

---

**2** At trial, Christina admitted that she initially lied to police, stating that defendant was not with her that night at the bar.

**3** At trial, Christina denied ever having a relationship with Garcia or being boyfriend and girlfriend. Her testimony was impeached by Patricia, who testified that Christina and Garcia had dated, and by Detective Johnson, who testified that Christina told him that she and Garcia had a brief romantic relationship.

3

kiss before walking outside. Moments later, Garcia, Anthony, and Danny walked out to Anthony's car, which was parked in front of the bar's entrance. As Garcia walked around the back of the car, defendant emerged from behind another parked car and shot Garcia in the back. When the shooting stopped, Garcia was lying face down by the rear, passenger-side tire with several gunshot wounds to his back.

Christina, Patricia, and Montoya left the bar about the same time as Garcia. As they did, they heard gunshots and ran back inside. Christina and Patricia denied seeing the person who shot the gun; however, Montoya identified defendant as the shooter. When the shooting stopped, they ran to Patricia's car and left without defendant. They drove to Christina's house but left a short time later after receiving a call from defendant asking them to pick him up. They did not discuss the shooting when they picked defendant up. When they returned, Montoya heard defendant say something to the effect of "I took care of it" or "it's handled."

Defendant had been talking to Bencomo and others on the sidewalk in front of the bar when he suddenly "ran off" and shot Garcia. Bencomo also identified defendant as the shooter.

Defendant fled the scene with Bencomo and Bencomo's two friends. Defendant did not have a phone and used Bencomo's to communicate with Christina. According to Bencomo, Christina sent Bencomo text messages looking for defendant.[4] Bencomo and his friends eventually dropped defendant off in a parking lot at the intersection of 21st Avenue and Stockton Boulevard.

B. *The Defense*

The defense essentially conceded that defendant shot Garcia and that he did so because he believed Garcia raped Christina. The defense's theory at trial was that "[t]his

_____

[4] At trial, Christina denied sending any texts to Bencomo.

is a rash act by somebody [who's] been unduly provoked by a rape claim," and thus, defendant "did not act with the appropriate intent and mental state to constitute first degree murder." The defense argued defendant was guilty of voluntary manslaughter.

Christina and Patricia testified that they along with defendant spontaneously decided to go to the bar on the night of the shooting.

Montoya testified that he heard Christina tell defendant at the bar that Garcia had raped her, and that Christina told Montoya that defendant "just found out [about the rape] and is pissed."

Dr. Bennett Omalu, a neuropathologist, testified for the defense. He reviewed defendant's medical records and explained that defendant had suffered two traumatic brain injuries between the ages of 16 and 20, which increased his risk of developing chronic traumatic encephalopathy (CTE) and posttraumatic encephalopathy (PTE). Individuals who suffer from these conditions are at an increased risk of suffering from irrational behavior, loss of memory, mood swings, inability to perform intellectually, criminal tendencies, and violent tendencies. These symptoms can be temporarily exacerbated by the consumption of alcohol. Defendant was beginning to manifest symptoms of CTE and PTE, and Dr. Omalu "differential[ly]" diagnosed him with CTE and PTE but acknowledged that a definitive diagnosis could not be made until after death and a pathological examination of defendant's brain is performed.

## DISCUSSION
### I
### Any Error in Excluding Evidence That Garcia Abused Christina Was Harmless

Defendant contends that the trial court abused its discretion and violated his right to present a defense under the state and federal Constitutions by excluding evidence that Garcia had physically abused Christina when the two had dated. According to defendant, "[e]vidence that Garcia had committed domestic violence against [Christina] made it more likely that [Christina] revealed the rape to [defendant] at the bar on the night of the

5

shooting rather than months earlier." He reasons that "[i]f [Christina] had been the victim of Garcia's domestic violence, then that would tend to make her angry at him and perhaps give her a motive to seek revenge against Garcia. A good way of accomplishing this might have been to get her current boyfriend ([defendant]) angry enough to want to attack him by claiming rape. If that was her goal, then it would make more sense to reveal the alleged rape to [defendant] at a time when he would most likely explode. That time would be at a moment when Garcia was in the vicinity as opposed to a moment when [Christina] and [defendant] were privately and calmly discussed what happened to her."

At trial, Christina denied ever having a relationship with Garcia or being boyfriend and girlfriend. During his cross-examination of Detective Johnson, defendant's trial counsel asked Johnson whether Christina stated that she had been in a "relationship" with Garcia, and Johnson indicated that she had and that the relationship lasted about two months. Counsel then asked Johnson whether Christina indicated that "during the time that she was in a relationship with [Garcia] he was abusive to her?" The prosecutor objected, and the trial court sustained the objection on relevance and Evidence Code section 352 grounds.

We need not decide whether the subject evidence is relevant or whether its probative value is substantially outweighed by the probability that is admission would have been unduly prejudicial because, even if it had been admitted, there is no reasonable probability that defendant would have received a more favorable verdict given the overwhelming evidence of premeditation and deliberation.

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) It is divided into two degrees. (§ 189.) " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. [Citations.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181;

6

see also §§ 187, subd. (a), 189.) "Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' [citation], the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter . . . . [Citation.] Such heat of passion exists only where 'the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " ' [Citation.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 (*Carasi*).)

"[T]he ' "existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation" ' — an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree. [Citations.]" (*Carasi*, *supra*, 44 Cal.4th at p. 1306.) "The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective. [Citations.] . . . The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective. [Citations.]" (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Even assuming that Christina first told defendant about the rape at the bar and that such a revelation would have provoked an ordinary person of average disposition to act rashly, the evidence does not support a finding that defendant acted rashly in shooting Garcia. To the contrary, the evidence adduced at trial revealed that after Christina identified Garcia as one of her rapists, defendant told Christina to stay away from Garcia. Defendant did not attack Garcia or otherwise confront him. Rather, he sat and watched as Christina danced with her sister, procured a loaded handgun from Bencomo, and waited until closing time when Garcia was preparing to get into a car and leave before

7

shooting him five times in the back. On this record, we conclude that there is no reasonable probability defendant would have received a more favorable verdict had the evidence of abuse been admitted. Accordingly, any error in excluding such evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 835-836.)

We reject defendant's claim that the exclusion of such evidence violated his constitutional rights to produce evidence on his behalf and to a fair trial, requiring us to determine whether the claimed error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705]). "The general rule remains that ' "the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 155, fn. omitted.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Here, defendant was able to present evidence of his defense, namely that Garcia's shooting was "a rash act by somebody [who's] been unduly provoked by a rape claim," including evidence that he first learned of the rape at the bar prior to the shooting. Even assuming for purposes of this appeal that the exclusion of evidence Garcia abused Christina was error, it did not amount to a constitutional violation.

## II
## The Trial Court Properly Admitted the Autopsy Photographs

Defendant next contends that the trial court abused its discretion and violated his state and federal constitutional rights to due process and to a fair trial by admitting, over his objection, autopsy photographs depicting Garcia's wounds. He argues the

photographs were irrelevant and substantially more prejudicial than probative. (Evid. Code, §§ 350, 352.) We disagree.

At trial, the prosecution sought to introduce ten autopsy photographs depicting entry and exit wounds on Garcia's torso. Defendant objected pursuant to Evidence Code section 352, arguing that the photographs were "more prejudicial than probative, given Dr. Reiber [(the forensic pathologist)] can adequately describe [the injuries] and has produced a diagram that can be used instead of these pictures." The trial court overruled defendant's objection, finding the photographs had "a relevant evidentiary purpose" and were "pretty clinical . . . overall" and "not particularly gruesome."

"Autopsy photographs of a murder victim 'are always relevant at trial to prove how the crime occurred; the prosecution need not prove these details solely through witness testimony.' (*People v. Carey* (2007) 41 Cal.4th 109, 127.) In addition, '[s]uch photographs may . . . be relevant to prove that the killer acted with malice.' (*Ibid.*)" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 (*Sattiewhite*).)

The autopsy photographs at issue here are relevant to the issue of malice, i.e. whether defendant possessed a specific intent to kill. Contrary to defendant's argument, the fact that "Dr. Reiber . . . was planning on establishing for the jury each of Garcia's wounds and how they were caused" did not make the photographs irrelevant. (*Sattiewhite*, *supra*, 59 Cal.4th at p. 471.)

Defendant's claim that the photographs were irrelevant because "there was no dispute as to how Garcia was killed, or even by whom" also lacks merit. Defendant, who pleaded not guilty, did not testify and admit that he intended to kill Garcia. The prosecution therefore had to prove its case, and as just discussed, the photographs were relevant evidence. (*Sattiewhite, supra*, 59 Cal. 4th at p. 471.)

Assuming we conclude, as we have, that the photographs are relevant, defendant argues that the risk of undue prejudice from their admission substantially outweighed any probative value. While defendant acknowledges that "the photographs admitted in [his]

9

case were not as gruesome as those admitted in other cases," he claims that "photographs depicting the holes in Garcia's body, particularly those providing a close-up view of [the wounds], are disturbing and repulsive." (Evid. Code, § 352.) We have reviewed the photographs, and although they are unpleasant, we find that the trial court could reasonably conclude that the danger of undue prejudice from their admission did not substantially outweigh their probative value. We note that the photographs are limited to Garcia's torso and the entrance and exit wounds thereto. They do not show his face or any other part of his body. Moreover, the wounds that are depicted appear to have been cleaned; no blood is shown.

Finally, "because the trial court did not abuse its discretion in finding the photographs relevant and not unduly prejudicial, there was no violation of defendant's constitutional rights." (*Sattiewhite*, *supra*, 59 Cal.4th at p. 472.)

### III
### Defendant Was Not Prejudiced by Trial Counsel's Alleged Errors

Defendant also contends that his trial counsel was ineffective in (1) failing to request CALCRIM No. 522, which would have told the jury that provocation may reduce a murder from first degree to second degree, and (2) failing to request that references to defendant's gang membership be redacted from a recording that was played for the jury. As we shall explain, defendant was not prejudiced by either of the alleged errors. Accordingly, we need not determine whether counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 697 [80 L.Ed.2d 674] (*Strickland*).)

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory

10

explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see also *Strickland, supra,* 466 U.S. 668, at pp. 687-688, 694.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

*A. CALCRIM No. 522*

Defendant claims that his trial counsel was deficient in failing to request the jury be instructed in the language of CALCRIM No. 522. CALCRIM No. 522 provides in pertinent part: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder." CALCRIM No. 522 is based on the concept that " ' "existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation" ' — an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree."

11

(*Carasi*, *supra*, 44 Cal.4th 1263, 1306; see also *People v. Avila* (2009) 46 Cal.4th 680, 707.)[5]

Here, while the jury was not instructed in the language of CALCRIM No. 522, it was instructed on the difference between first and second degree murder: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. [¶] The defendant acted willfully if he intended to kill. [¶] The defendant acted deliberately if he carefully weighed the consideration for and against his choice and knowing the consequences decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] The length of time that the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. [¶] The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] *A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated.* [¶] On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. [¶] If the People have not met this burden, you must find the defendant not guilty of first degree murder." (Italics added.) The jury also was provided a verdict forms containing a verdict for the lesser included offense of second degree murder.

In finding defendant guilty of first degree murder, the jury necessarily found that his decision to kill was not rash or impulsive but carefully considered. If jurors believed defendant was so provoked that he could not deliberate or premeditate, they would not

---

[5] As defendant rightly concedes, the trial court had no duty to instruct with CALCRIM No. 522 absent a request, and no such request was made here. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-879.)

12

have found him guilty of first degree murder.  It is not reasonably probable that one or more jurors would have found defendant not guilty of first degree murder had the jury also been specifically told that provocation could be considered in making that determination.  (See *People v. Avila*, *supra*, 46 Cal.4th at pp. 707-708.)

Moreover, as previously discussed, there was overwhelming evidence that defendant premeditated and deliberated Garcia's killing.

In sum, defendant has not shown trial counsel was ineffective for failing to request CALCRIM No. 522.

*B.  Gang References*

Defendant asserts that his trial counsel also was ineffective in failing to request that purported references to his gang membership be redacted from the recording of the conversation between Danny and Anthony Campos.

Prior to trial, defendant moved to exclude evidence he was a validated gang member.  The People did not oppose the motion, and the court granted it.  At trial, the prosecutor played a videotape of a conversation between Anthony and Danny Campos, in which they discussed the shooting.  As pertinent here, the following exchange occurred:

"ANTHONY:  So I hear a shot, thought I was shot, and someone gets shot.

"DANNY:  It was like gang members, you know.

"ANTHONY:  You get shot don't feel it.

"DANNY:  Uh huh.  He had a .22.

"ANTHONY:  Wow, a .22?  I thought it was a .38 [unintelligible.]

"DANNY:  It was a [unintelligible.]

"ANTHONY:  You seen it?

"DANNY:  Yeah.

"ANTHONY:  Like a revolver?  Long gun?

"DANNY:  A .38, something like that.

"ANTHONY: [Unintelligible] punk, coward. Geez, what a night, dude. Fuck. I should be cleaning the dishes.

"DANNY: Who? Oh yeah. Oh yeah. [Unintelligible] be a Sureño?

"ANTHONY: What, the dude shooting?

"DANNY: [unintelligible.]"

We recognize the potentially prejudicial effect of evidence of gang membership, especially in a case devoid of gang evidence. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) But even assuming that the failure to request the redaction of the passing and ambiguous references to "gang members" and "a Sureño" was error, we conclude it was harmless in light of the overwhelming evidence of first degree murder.

DISPOSITION

The judgment is affirmed.

_____/s/_____
Blease, Acting P. J.

We concur:

_____/s/_____
Robie, J.

_____/s/_____
Mauro, J.

14